# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

Zurich American Insurance
Company, as subrogee of The
Westin Peachtree Plaza,

               Plaintiff,

v.                                                              Case No. 1:19-cv-4807-MLB

Steve Ayers Construction Co., Inc.
and Smyrna Rigging Co., Inc.,

               Defendants.

_____/

## OPINION & ORDER

This matter involves a fire that occurred at the Westin Peachtree

Plaza Hotel in 2018.  After paying an insurance claim, Plaintiff Zurich

Insurance Company sued in subrogation Defendants Steve Ayers

Construction Co., Inc. ("SAC") and Smyrna Rigging Co., Inc. ("SRC"),

claiming they caused the fire while welding on the hotel roof.  (Dkt. 1.)

There are a bunch of motions before the Court.  Defendant SAC moves

for summary judgment.  (Dkt. 71.)  It also seeks sanctions against

Plaintiff for alleged spoliation of evidence.  (Dkt. 88.) Plaintiff filed its

own motion for spoliation sanctions and also moves to exclude at trial certain evidence Defendant SAC's fire causation expert relied upon. (Dkts. 70; 69.)   Plaintiff also seeks to exclude certain testimony and opinions from that expert and another expert retained by Defendant SAC.  (Dkts. 68; 77.)  Defendant SRC moves to join Defendant SAC's motions.  (Dkt. 109.)  The Court addresses each.

## I.   Summary Judgment

### A.   Legal Standard

Federal Rule of Civil Procedure 56 provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is material if it "might affect the outcome of the suit under the governing law."  *W. Grp. Nurseries, Inc. v. Ergas*, 167 F.3d 1354, 1360 (11th Cir. 1999) (citing *Anderson*, 477 U.S. at 248).   A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.* at 1361 (citing *Anderson*, 477 U.S. at 248).

The party moving for summary judgment bears the initial burden of showing the court, by reference to materials in the record, that there

is no genuine dispute as to any material fact. *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1260 (11th Cir. 2004) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).  The nonmoving party then has the burden of showing that summary judgment is improper by coming forward with "specific facts" showing there is a genuine dispute for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citing Fed. R. Civ. P. 56(e)).  Ultimately, there is no "genuine issue for trial" when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Id.* (citing *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)).  "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson*, 477 U.S. at 247–48.  A district court must "resolve all reasonable doubts about the facts in favor of the non-movant[] and draw all justifiable inferences in his or her favor." *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993) (alteration adopted) (quoting *United States v. Four Parcels of Real Prop.*, 941 F.2d 1428, 1437 (11th Cir. 1991)).

### B.   The Court's Use of Proposed Facts and Responses

The Court draws the facts largely from the parties' submissions.  In support of its motion for summary judgment, Defendant SAC filed a statement of undisputed material facts (Dkt. 71-1).  *See* LR 56.1(B)(1), NDGa.  Plaintiff responded to Defendant SAC's statement of material facts (Dkt. 91).  *See* LR 56.1(B)(2)(a).  Plaintiff also filed a separate statement of facts that it contends are material and present genuine issues for trial (Dkt. 92).  *See* LR 56.1(B)(2)(b).  Defendant SAC responded to Plaintiff's statement of additional facts (Dkt. 100).  *See* LR 56.1(B)(3).

The Court uses the parties' proposed facts and responses as follows. When a party does not dispute the other's fact, the Court accepts it for purposes of summary judgment and cites the proposed fact and corresponding response.  When one side admits a proposed fact in part, the Court includes the undisputed part.  When one side denies the other's proposed fact in whole or in part, the Court reviews the record and determines whether a fact dispute exists.  If the denial lacks merit, the Court deems the fact admitted so long as the record citation supports it.

If a fact is immaterial, it is excluded.[1]  If a fact is stated as an issue or legal conclusion, it is excluded.  *See* LR 56.1(B)(1)(c).  Where appropriate, the Court modifies one party's fact per the other's response when the latter better reflects the record.  Finally, as needed, the Court draws some facts directly from the record.  *See* Fed. R. Civ. P. 56(c)(3) ("The court need consider only the cited materials, but it may consider other materials in the record.").

### C.  Background Facts

In 2018, a company known as SLC owned the Westin hotel. (Dkts. 71-1 ¶ 9; 91 ¶ 9; 92 ¶ 2; 100 ¶ 2.)  It contracted with Defendant SAC for various construction projects including the installation of a handrail on the hotel roof.  (Dkts. 71-1 ¶ 1; 91 ¶ 1.)  Defendant SAC, in turn, subcontracted with Defendant SRC to install the handrail.  (Dkts. 71-1 ¶ 2; 91 ¶ 2; 92 ¶ 12; 10 ¶ 12.)  Defendant SRC prepared the plans to install

---

[1] Some proposed facts the Court declines to exclude on materiality grounds are not "material" as that term is generally employed in the summary judgment context.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (identifying material facts as those that "might affect the outcome of the suit under the governing law").  Some are included for background purposes or to generate context for the Court's analysis.  Which facts ultimately prove material should be apparent from the analysis.

the handrail, prefabricated the handrail in its own metal shop, and brought it to the hotel for installation.  (Dkts. 71-1 ¶¶ 3–4; 91 ¶¶ 3–4.) Defendant SRC also supplied its own employees to perform the work and did the work according to its own plans and methods of installation. (Dkts. 71-1 ¶¶ 5, 6; 91 ¶¶ 5, 6.)  Every morning before Defendant SRC started working on the railing, it contacted Stacey Flannigan (one of Defendant SAC's employees) to get on the roof.  (Dkts. 71-1 ¶ 7; 91 ¶ 7.) Mr. Flannigan checked to make ensure Defendant SRC had fire extinguishers and fall protection but was not involved in the installation process.  (Dkts. 71-1 ¶ 8; 91 ¶ 8.)

On March 15, 2018, Defendant SRC was at the Westin performing so-called "hot work" (welding and grinding) on the roof as part of the handrail installation project.  (Dkts. 71-1 ¶ 12; 91 ¶ 12.)  While they were doing so, a fire started and burned within and through the hotel's laundry lint exhaust shaft.  (Dkts. 71-1 ¶ 10; 91 ¶ 10.)  Plaintiff contends Defendant SRC started the fire by allowing a spark from welding or grinding to fall into the laundry lint exhaust shaft and ignite accumulated lint within the laundry system.  (Dkts. 71-1 ¶ 13; 91 ¶ 13.) For their part, Defendants contend the hotel had a problem with dryer

lint which may have caused the fire (as it had several times before). They also claim the hotel's fire suppression system failed to work properly, thus allowing the fire to spread more than it should have.

Plaintiff Zurich claims it insured the Westin and indemnified the hotel for losses from the fire totaling $894,803. (Dkts. 71-1 ¶ 15; 91 ¶ 15.) The breakdown of the payments is described in Plaintiff's statement of loss. (Dkts. 71-1 ¶ 16; 91 ¶ 16.) One payment for $269,617 was for two laundry folder machines damaged in the fire. (Dkts. 71-1 ¶ 19; 91 ¶ 19.) Plaintiff also paid Marriott $435,819 ($454,421 minus $18,602 in ironer repairs) in replacement value for personal property and equipment damaged at the hotel without any deduction for depreciation. (Dkts. 71-1 ¶ 29; 91 ¶ 29.) Finally, it paid Marriott $27,286 in replacement value for VAT flooring in the laundry room, which was at least six years old, without deducting for depreciation. (Dkts. 71-1 ¶¶ 30–31; 91 ¶¶ 30–31.) [2] After making the payments, Plaintiff brought this subrogation lawsuit

---

[2] Defendant SAC refers to the flooring as "VAT flooring" in its motion for summary judgment (Dkt. 71) and statement of material facts (Dkt. 71-1). Plaintiff and Defendant SAC, however, refer to the flooring as "VCT flooring" in their response and reply briefs. (Dkts. 93; 101.) The distinction is immaterial for the Court's Order, but for consistency, the Court will refer to the flooring as "VAT flooring."

against Defendant SAC for breach of contract and against both Defendant SAC and Defendant SRC for negligence. (Dkt. 1.)

**D.   Discussion**

**1.   Negligence**

Plaintiff sued Defendant SAC for negligence, alleging Defendant breached its duty by (acting through Defendant SRC) to cause the fire in the laundry system. (Dkt. 1 ¶ 22.) "It is well established that to recover for injuries caused by another's negligence, a plaintiff must show four elements: a duty, a breach of that duty, causation, and damages." *Collins v. Athens Orthopedic Clinic, PA*, 837 S.E.2d 310, 312 (Ga. 2019). The lack of a genuine issue of material fact on any of the elements requires entry of summary judgment for the defendant. *Patterson v. Wright*, 840 S.E.2d 762, 763 (Ga. Ct. App. 2020). Defendant SAC argues it is entitled to summary judgment because there is no genuine issue of material fact as to duty. (Dkt. 71-2 at 11.)

Under Georgia law, "[a] person who engages an independent contractor is generally not responsible for any torts committed by the independent contractor." *Green v. Home Depot U.S.A., Inc.*, 627 S.E.2d

836, 839 (Ga. Ct. App. 2006); *see also* O.C.G.A. § 51-2-4.  An employer,

however, can be held liable for an independent contractor's negligence:

> (1) When the work is wrongful in itself or, if done in the ordinary manner, would result in a nuisance;
>
> (2) If, according to the employer's previous knowledge and experience, the work to be done is in its nature dangerous to others however carefully performed;
>
> (3) If the wrongful act is the violation of a duty imposed by express contract upon the employer;
>
> (4) If the wrongful act is the violation of a duty imposed by statute;
>
> (5) If the employer retains the right to direct or control the time and manner of executing the work or interferes and assumes control so as to create the relation of master and servant or so that an injury results which is traceable to his interference; or
>
> (6) If the employer ratifies the unauthorized wrong of the independent contractor.

O.C.G.A. § 51-2-5.  Plaintiff does not dispute that Defendant SRC is an

independent contractor.   Instead, Plaintiff argues Defendant SAC is

liable for Defendant SRC's negligence under subsections (3) and (4).[3]

---

[3] Because the Court finds there is a dispute on whether Defendant SAC is liable for Defendant SRC's negligence under O.C.G.A. § 51-2-5(3), the Court need not address whether there is a dispute as to whether Defendant SAC is also liable under O.C.G.A. § 51-2-5(4).

(Dkt. 93 at 5.)  Plaintiff also contends Defendant SAC expressly agreed to be responsible for any negligence by Defendant SRC.  (*Id.*)

Liability under subsection (3)—that is, liability imposed by express contract upon the employer—recognizes the fundamental principle that "where a person contracts to do a certain thing, he cannot evade liability by employing another to do that which he has agreed to perform." *Crispens Enter., Inc. v. Halstead*, 433 S.E.2d 353, 355 (Ga. Ct. App. 1993) (quoting *Atlanta & Fla. R. Co. v. Kimberly*, 13 S.E. 277, 278 (Ga. 1891)). Defendant SAC concedes that it had a contract with the Westin (through SLC) and that the contract (specifically Charge Order 03C) required it to add "New Square HSS Tube Rail (2" x 2" x ¼")" safety handrail on the tenth floor of the Westin.  (Dkts. 71-1 ¶ 1; 91 ¶ 1; 92 ¶ 11; 100 ¶ 11.) Defendant SAC subcontracted that work to Defendant SRC.  (Dkts. 71-1 ¶ 2; 91 ¶ 2; 92 ¶ 12; 10 ¶ 12.)  But Defendant SAC cannot escape the consequences of breaching an express obligation to Plaintiff simply by hiring a subcontractor.  *See French v. Sinclair-Oconee Homes of Milledgeville, LLC*, 658 S.E.2d 226, 227 (Ga. Ct. App. 2008).  The contract to install the handrail, "with its attendant obligations," was between Defendant SAC and SLC, not between Plaintiff and an independent

contractor. *Hudgins v. Bacon*, 321 S.E.2d 359, 366 (Ga. Ct. App. 1984);

*see also Nulite Indus. Co. v. Horne*, 556 S.E.2d 255, 257 (Ga. Ct. App.

2001) ("[Defendant] does not dispute that by written agreement with

[plaintiff], it undertook to install the siding and windows. Therefore, it

may not escape liability by arguing that it employed an independent

contractor to perform its obligations."). The Court thus denies Defendant

SAC's motion for summary judgment as to Plaintiff's negligence claim.[4]

## 2.    Breach of Contract

Plaintiff sued Defendant SAC for breach of contract, alleging

Defendant SAC breached its contractual duties by, acting through

---

[4] Plaintiff also argues Defendant SAC expressly assumed liability for the negligence of Defendant SRC and expressly assumed responsibility for complying with all applicable laws, statutes, rules, ordinances, and regulations. (Dkt. 93 at 7, 11.) As part of this, Plaintiff quotes provision 8.01 from the "General Conditions to the Major Construction" agreement which it contends is between the Westin and Defendant SAC. (*Id.*) The provision states, "[c]ontractor shall be fully liable for the negligent acts, errors, omissions and willful misconduct of Contractor and any of its subcontractors." (*Id.* at 7.) There is, however, a dispute about whether the quoted contract is the relevant contract between Defendant SAC and SLC because Defendant SAC contends it did not sign that document. (Dkt. 100 ¶ 14.) As to Defendant SAC's compliance with applicable laws, Plaintiff quotes provision 1.01 from the agreement. (Dkt. 93 at 11.) But again, there is a dispute on whether this contract is the relevant contract between Defendant SAC and SLC. (Dkt. 100 ¶ 13.) In the light of that factual dispute, the Court also denies Defendant SAC's motion for summary judgment on Plaintiff's negligence claim.

Defendant SRC, igniting a fire in the laundry room of the hotel.  (Dkt. 1 ¶ 19.)  Again, Defendant SAC concedes it had a contract with the Westin hotel (through SLC) but moves for summary judgment, contending Plaintiff cannot articulate a cognizable breach of contract claim for which it has standing.  (Dkt. 71-2 at 13.)  Specifically, Defendant SAC argues Plaintiff has not identified the operative contract.  It also argues that there is no evidence Plaintiff's insured (Marriott) was a party to any contract with it or that Plaintiff otherwise obtained the right to bring an action for the Westin's/SLC's alleged loss.  (*Id.*)

"Subrogation is [t]he substitution of one person in the place of another with reference to a lawful claim, demand or right, so that he who is substituted succeeds to the rights of the other in relation to the debt or claim, and its rights, remedies, or securities."  *Fin. Sec. Assur., Inc. v. Stephens, Inc.*, 500 F.3d 1276, 1287 (11th Cir. 2007) (quoting *Jones v. Motor Co. v. Anderson*, 602 S.E.2d 228, 230 (Ga. Ct. App. 2004)).  Subrogation rights can arise from equity, contract, or statute.  *See Jones Motor Co.*, 602 S.E.2d at 230.  Plaintiff contends that, in provisions 1.01 and 8.01 of the "General Conditions to the Major Construction" agreement, Defendant SAC agreed that it would be responsible under the

contract not only to SLC, but also to Marriott.  (Dkt. 93 at 13.)  Section 1.01 states the contractor would "defend, indemnify and hold harmless Owner and Manager and each of their related companies" for code violations.  (Dkts. 92 ¶ 13; 100 ¶ 13.)  Section 8.01 states the contractor would "indemnify, defend and hold harmless Owner, Marriott International, Inc." for the negligence of any subcontractors.  (Dkts. 92 ¶ 14; 100 ¶ 14.)  There appears to be a dispute about the relevant contract. While conceding a contracted existed, Defendant SAC argues the quoted contract is not relevant because it did not sign that alleged contract. (Dkt. 100 ¶ 10.)  But Defendant identified the "General Conditions to the Major Construction" agreement as the relevant contract during discovery.  And even if this identification is not enough, there is a genuine dispute as to whether this is the relevant, enforceable contract.  And, again, Defendant admits it had a contract with SLC.  The Court thus denies Defendant SAC's motion for summary judgment on the grounds Plaintiff has failed to identify an enforceable contract.[5]

---

[5] Plaintiff also argues even though it did not obtain a formal assignment of claim, because it paid a claim on behalf of its insured, it has an equitable right to pursue subrogation. (Dkt. 93 at 14.) Because the Court denies Defendant SAC's motion for summary judgment on other grounds, the Court does not address this argument.

Having identified disputed facts as to Marriott's contractual rights, Plaintiff must still show that it has a right to assert claims (on Marriot's/SLC's behalf) for damages arising from the fire. An insurance company can only seek subrogation for losses it was legally obligated to pay. As part of this, Georgia law provides that "[n]o insurance contract on property or of any interest therein or arising therefrom shall be enforceable except for the benefit of persons having, at the time of the loss, an insurable interest in the things insured." O.C.G.A. § 33-24-4(b). An "insurable interest" means "any actual, lawful, and substantial economic interest in the safety or preservation of the subject of the insurance free from loss, destruction, or pecuniary damage or impairment." O.C.G.A. § 33-24-4(a).

An insurance company thus cannot seek subrogation for voluntary payments outside of an insurable interest. So-called "voluntary payments" are "[p]ayments of claims made through ignorance of the law or where all the facts are known and there is no misplaced confidence and no artifice, deception, or fraudulent practice used by the other party." O.C.G.A. § 13-1-13. These payments "cannot be recovered unless made under an urgent and immediate necessity therefor or to release person or

property from detention or to prevent an immediate seizure of person or property." *Id.* "The general rule is that an insurer's voluntary payment to its insured does not give rise to a right of subrogation." *S. Mut. Church Ins. Co. v. ARS Mech., LLC*, 703 S.E.2d 363, 366 (Ga. Ct. App. 2010). A party seeking to recover payment—for example, an insurance company seeking subrogation—bears the burden of showing the voluntary payment doctrine does not apply. *Id.*[6]

Defendant SAC contends the record contains no evidence Marriott has an insurable interest in the hotel and personal property damaged in the fire. More specifically, Defendant SAC says Plaintiff paid Marriott

---

[6] In response to Defendant SAC's motion for summary judgment, Plaintiff filed an assignment and ratification agreement signed by SLC and purporting to assign to Plaintiff all SLC's rights to recovery against Defendant SAC. (Dkts. 92-4; 93-5.) Defendant SAC says the Court should not consider the document because it was not produced during discovery. The Court agrees. Federal Rule of Civil Procedure 37 states that "[i]f a party fails to provide information . . . as required by Rule 26(a) or (e), the party is not allowed to use that information . . . to supply evidence . . . unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). Defendant SAC requested "[a]ny and all agreements drafted, exchanged, or executed that relate to assignment of claims arising from the subject property damage described in Plaintiff's Complaint." (Dkt. 71-12 ¶ 20.) Plaintiff responded, directing Defendant SAC to the insurance policy. (*Id.*) It did not produce the assignment and Plaintiff has failed to show that its failure to do so was justified or harmless. *See Mitchell*, 318 F. App'x at 824. The Court does not consider it.

for damages to the Westin Hotel (owned by SLC) pursuant to an insurance contract Plaintiff had with Marriott but the record contains no evidence Marriott actually had any insurable interest in the Westin hotel. (Dkt. 71-2 at 15.) It says, "[t]here is no dispute that the real property was owned by SLC, an entity other than Marriott." (*Id.* at 17.) It argues Plaintiff made payments to Marriott without seeing any documents showing Marriott had an ownership interest in SLC. (*Id.*) Defendant SAC also contends Plaintiff made payments for personal property damage even though the equipment in the laundry was owned by SLC, not Marriott. (*Id.* at 18.) As a result of all this, Defendant SAC says the record evidence shows Plaintiff's payments to Marriott were non-recoverable, voluntary payments.

Plaintiff tried to clarify this at summary judgment with a declaration from Horace Jordan (a Marriot employee), stating unequivocally the Westin hotel is a wholly owned Marriott property and that Marriott is the "100% ultimate owner of all real and personal property of the hotel." (Dkt. 91-2 ¶¶ 5–6.) Defendant says Plaintiff should not be able to use this declaration because Plaintiff failed to disclose Mr. Jordan as a witness during discovery. The Court agrees.

Federal Rule of Civil Procedure 26(a)(1)(A)(i) requires a party to disclose "the name and, if known, the address and telephone number of each individual likely to have discoverable information—along with the subjects of that information—that the disclosing party may use to support its claims or defenses, unless the use would be solely for impeachment." Fed. R. Civ. P. 26(a)(1)(A)(i). The disclosure rule is enforced through Rule 37(c)(1), which provides that "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). And, under Rule 26(e)(1)(A), supplementation of incorrect responses is required. Thus, "the obligation to disclose pertinent parties is continuing [throughout the case]." *F.T.C. v. Nat'l Urological Grp., Inc.*, 645 F. Supp. 2d 1167, 1179 (N.D. Ga. 2008). The non-disclosing party bears the burden of showing that the failure to comply with Rule 26 was substantially justified or harmless. *Mitchell v. Ford Motor Co.*, 318 F. App'x 821, 824 (11th Cir. 2009).

Defendant SAC repeatedly asked for discovery regarding Westin's ownership. (*See* Dkts. 71-12 ¶¶ 21–22; 50 at 2–3; 51-1 at 4.) Plaintiff did not disclose Mr. Jordan as a person with information to support Plaintiff's claims in its initial disclosures or in response to Defendants' discovery requests. Plaintiff withheld Mr. Jordan's name until April 14, 2021 when it responded to Defendant SAC's motion for summary judgment. (Dkts. 91-2; 91-4; 92-1; 92-3.) That was more than one month after the discovery period had expired. Even if unintentional and accidental, Plaintiff's conduct was not justified or harmless. But, regardless, the information contained in the Jordan Declaration was also provided by Marriott's 30(b)(6) deponent. Specifically, Ronald Tarson, testified that SLC is a wholly-owned subsidiary of Starwood Hotels, LLC, which is a wholly-owned subsidiary of Marriott.[7] (Dkts. 72-1 at 87:6–10;

---

[7] Defendant SAC objects to this fact "because [the deponent] does not have personal knowledge to support this contention. . . . [The deponent] denied having any knowledge of any documents supporting his contention or any way of proving the alleged ownership structure." (Dkt. 100 ¶ 3.) Mr. Tarson testified that he did not know if there were any documents that reflect the relationship between Marriott and SLC. (Dkt. 72-1 at 87:11–14.) But the lack of knowledge *about documentation* does not equate to lack of knowledge about the relationship. In reaching the conclusion that Mr. Tarson's testimony is sufficient to create an issue of fact, the Court understands that Plaintiff produced no documents

92 ¶ 3; 100 ¶ 3.)  This testimony is sufficient to raise an issue of material fact as to whether Marriot had an insurable interest in the Westin hotel.

Defendant SAC also says Plaintiff has not presented evidence showing the Westin hotel was an insured location under the policy.  (Dkt. 71-2 at 17–18.)  In other words, it says, even if Marriott owned the hotel, the record contains no evidence the hotel (and personal property in it) were covered by Plaintiff's insurance agreement with Marriott.  Plaintiff, again, addressed this at summary judgment with a new declaration, this one from Amadou Njie.  (Dkt. 91-4.)  That declarant, Marriott's Director of Insurance Placement, testified by declaration that "[t]he Westin Peachtree Plaza Hotel at 210 Peachtree Street, N.C., Atlanta, Georgia is a scheduled location (location #183) on the schedule of value for Marriott International, Inc.'s insurance policy with [Plaintiff]." (*Id.* ¶ 3.)  Attached to the declaration is also "an extract from the schedule of values showing The Westin Peachtree Plaza Hotel as location 183." (*Id.* at 2–3.)

---

showing Marriott has an ownership interest in SLC or any of the real or personal property damaged at the Westin.  (Dkts. 71-1 ¶ 22; 91 ¶ 22.)  In addition, Plaintiff's claim file produced to Defendant SAC has no documents reflecting Marriott's alleged ownership in SLC.  (Dkts. 71-1 ¶ 26; 91 ¶ 26.)  It may not be really strong evidence, by Mr. Tarson's testimony is enough to avoid summary judgment.

While Defendant says this declaration should be excluded for the same reasons the Court excludes Mr. Jordan's declaration, the Court disagrees.  At a hearing on January 18, 2022, Defendant conceded that Amadou Njie was identified in claim files Plaintiff produced during discovery.  (January 18, 2022 Tran at 2.)[8]  Defendant also conceded Plaintiff disclosed the schedule of values, which lists the Westin as an insured location, during discovery and in advance of Westin's 30(b)(6) deposition.  Indeed, Plaintiff identified it as part of the insurance policy and said it should be considered "a supplement to [Plaintiff's] previous document production."  (Tran, at 5–7; Dkt. 91-7.).  As a result, the Court will consider the schedule of values, which specifically identified the Westin hotel as an insured location.  Doing so, and for the reasons discussed in the January 18, 2022 hearing, the Court denies Defendant SAC's motion for summary judgment.[9]

---

[8] The Court cites to the page of a rough transcript it obtained as the parties have not yet ordered or filed a final version of the transcript.

[9] Defendant SAC also makes a one-sentence argument that "there is no evidence in the record showing how the laundry folders were damaged, what was wrong with them, and why they could not be simply fixed rather than replaced." (Dkt. 71-2 at 19.)  But this is incorrect.  Plaintiff's independent adjuster went to the Westin, inspected the laundry folders, saw they were damaged, and determined the cost of repairs exceeded the

As a final argument, Defendant SAC asks the Court to hold Plaintiff has not provided sufficient evidence to calculate its damages in connection with the personal property damages of $435,819. (Dkt. 71-2 at 20–23.)[10] Alternatively, it says the Court should hold that Plaintiff cannot recover replacement value for the personal property. (*Id.*) Plaintiff contends it need not show the fair market value of real property and replacement costs are recoverable. (Dkt. 93 at 19.)

"Where tangible personal property has been damaged or destroyed, the plaintiff has the burden of furnishing evidence sufficient to enable the jury to calculate the amount of damages with reasonable certainty without speculation." *Champion v. Dodson*, 587 S.E.2d 402, 404 (Ga. Ct. App. 2003). To "[m]erely list . . . the damaged items, along with a

---

cost of replacement. (Dkt. 91-6 at 7.) Defendant SAC also contends Plaintiff "cannot provide any details" regarding $130,021 of damages for "the steam press, condensate pump motors, [and] scaffolding." (Dkt. 71-2 at 19.) But Plaintiff's independent adjuster determined scaffolding needed to enter the exhaust shaft to remove destroyed asbestos insulation and damage to the ductwork was a total loss with damage to the motors and steam presses. (Dkt. 91-6 at 6–7.)

[10] Defendant SAC initially raised an issue regarding Plaintiff's claim for loss associated with VAT floor without deducting for depreciation. But, in its reply brief, Defendant SAC "admits damages to the structure of the building in this case, such as the VCT flooring or ductwork, probably would be subject to repair costs without depreciation because it was part of the building." (Dkt. 101 at 7.)

monetary figure estimating replacement cost based entirely upon [an] original purchase price" is insufficient to establish damages. *Id.* at 405. In other words, "[e]vidence of the retail purchase price of property alone is not sufficient to establish the fair market value of the property at the time of the loss." *Id.* at 404. It is "the age and condition of the property, the fair market value at the time of loss, the condition immediately after the loss, and the fair market value immediately after the loss [that] must be proven to establish the damages." *Id.*

"As a general rule, damages for defective construction, whether those damages are the result of a breach of contract or negligence of the contractor, are determined by measuring the cost of repairing or restoring the damage, unless the cost of repair is disproportionate to the property's probable loss of value." *John Thurmond & Assocs., Inc. v. Kennedy*, 668 S.E.2d 666, 668 (Ga. 2008). "While the correct measure of damages for injury to realty itself is the difference in value of the property before and after the injury, the appropriate measure of damages if the injury is solely to the structure or building is the cost of the repairs." *BellSouth Telecomms., Inc. v. Helton*, 451 S.E.2d 76, 79 (Ga. Ct. App. 1994).

22

Defendant SAC challenges the recovery for personal property and the laundry folders, which Defendant SAC characterizes as personal property.  As to the personal property (excluding the laundry folders), Defendant SAC contends many items remain unspecified or unsupported by evidence.   (Dkt. 71-2 at 21.)   Plaintiff contends "estimates, comparisons, and opinions of others" as well as photographs, will "enable the jury to form their own opinion as to the damages alleged." *Oglethorpe Realty Co. v. Hazzard*, 321 S.E.2d 820, 822 (Ga. Ct. App. 1984).  This seems to be an issue for trial.

Plaintiff contends the laundry folders are fixtures, that is real property rather than personal property.  (Dkt. 93 at 22.)  Under Georgia law fixtures are realty (not personal property) and consist of "[a]ll things permanently attached to land or to the buildings thereon." O.C.G.A. § 44-1-2(a)(2).  "Anything which is intended to remain permanently in its place even if it is not actually attached to the land is a fixture which constitutes a part of the realty and passes with it." O.C.G.A. § 44-1-6(a).  "Machinery which is not actually attached to the realty but is movable at pleasure is not a part of the realty[] [and] [a]nything detached from the realty becomes personalty instantly upon being detached."  § 44-1-6 §§(b)–(c).

23

Whether a particular piece of personal property has become a fixture requires analysis of three distinct factors. First, the Court must consider the degree of physical attachment and removability of the article. *See Homac v. Fort Wayne Mortg. Co.*, 577 F. Supp. 1065, 1069 (N.D. Ga. 1983). Second, it must consider the intention of the parties with respect to the article's status. *See id.* Third, the Court should consider whether the requisite unity of title between the personalty and the realty was present at the time the article allegedly became a fixture. *See id.* at 1070.

Plaintiff contends the laundry folders are large pieces of equipment that are attached to the building, not easily manipulated or moved. (Dkts. 93 at 22; 91-8 at 3.) Defendant SAC argues Plaintiff's intent, as expressed by Plaintiff's employees, that the laundry folders were "personal property/equipment" is telling and shows the articles were not fixtures. (Dkts. 101 at 8; 73-1 at 55:19–56:8.) The Court finds there is a genuine issue of material fact about personal property, including the fixture doctrine. The parties can raise these issues at the close of evidence, but the Court cannot grant summary judgment as to replacement costs on the record before it.

## II.   Motions Other Than For Summary Judgment

### A.   Motion To Exclude Incident Reports and Article

Defendant SAC retained an expert witness, Christopher Porto, to investigate the fire, determine the cause of the fire, and identify contributing factors in the spread of the fire. (Dkt. 70-1 at 6.) As part of his analysis, Mr. Porto reviewed three incident reports from the City of Atlanta Fire Department about previous fires in the hotel's dryer duct system. One incident report, from a March 15, 2018 fire, included a statement that the fire was possibly caused by "buildup of lint in duct chute from dryer. Ignited by heat from Dryer" and that "no human factors contributed to the ignition." (Dkt. 70-2 at 4, 6.) The two other reports, from fires in July 2008 and March 2011, stated the fires ignited from "radiated, conducted heat" and that "no human factors contribut[ed] to [the] ignition." (Dkts. 70-3 at 4; 70-4.) He also relied upon a newspaper article discussing yet another fire in a dryer vent, that one occurring in May 1997. (Dkt. 70-1 at 20.) He also examined the duct work at issue and several fire dampers that had been installed at the time of the fire. (*Id.* at 14.) Mr. Porto ultimately authored a report expressing his opinion the fire could have started as a result of either the hot work Defendant

SRC's employees were performing on the roof or from the laundry room equipment.  (*Id.* at 21, 24.)  Since he could not exclude either source of the fire, he concluded the cause of the fire was "undetermined."  (*Id.*)  He further concluded the hotel's failure to limit the accumulation of lint in the exhaust ductwork contributed to the spread of the fire.  (*Id.* at 24.)  Finally, he concluded the hotel's alteration of one or more fire dampers and failure properly to inspect and test the dampers also contributed to the spread of the fire.  (*Id.* at 24.)

Plaintiff moves to exclude evidence of the incident reports and newspaper article at trial. (Dkt. 70.)  Plaintiff says the reports should be excluded because the firefighters who prepared them were not disclosed or qualified as fire causation experts.  (*Id.* at 6.)  The incident reports include factual details as well as conclusions about the origin and causation of the fires. (Dkts. 70-2; 70-3; 70-4.)  Plaintiff does not dispute the factual information within the reports, but argues Defendant SAC many not introduce new expert opinions of causation through the reports. (Dkt. 97 at 2.)  Defendant SAC responds arguing its fire expert can rely on hearsay evidence and, alternatively, the reports are excepted from hearsay. (Dkt. 86 at 4–6.)

26

Expert witnesses may base their opinions on inadmissible evidence if other experts would reasonably rely on that evidence in forming an opinion. *See* Fed. R. Evid. 703. Put differently, "an expert may rely on hearsay evidence as part of the foundation for his [or her] opinion so long as the hearsay evidence is 'the type of evidence reasonably relied upon by experts in the particular field in forming opinions or inferences on the subject.'" *Knight through Kerr v. Miami-Dade Cnty.*, 856 F.3d 795, 809 (11th Cir. 2017) (quoting *United States v. Scrima*, 819 F.2d 996, 1002 (11th Cir. 1987)). Mr. Porto testified by declaration that fire causation experts generally consider reports of prior fires at a location when forming opinions or inferences on the cause and origin of a fire. (Dkt. 79-1 ¶ 4.) He considers causation information in a prior-incident report as a *possible* cause and then performs further investigation. (Dkt. 81-1 at 41:14–42:8.) He did that here. He relied on a lot of information, including the fire incident reports, photographs and videos from the scene of the fire and of the laundry duct work after the fire, an inspection of the laundry room he conducted, and an examination he made of the dampers and duct work after they had been removed from the hotel. (Dkt. 56-1 at 6–7, 10.) The Court finds Mr. Porto may rely on these incident reports.

But, in order to avoid confusion and unfair prejudice (and as explained below), the Court exercises its discretion under Federal Rule of Evidence 403 to exclude information from the report and any expert testimony regarding the responding firefighters' hypotheses about the causes of the prior fires.

Defendant SAC also contends the incident reports are excepted from hearsay and can be reduced to an admissible form at trial. (Dkt. 86 at 5–7.) Defendant SAC argues the reports fall within the hearsay exceptions for public records and business records. (*Id.* at 5–6.) Both the public records and business records exceptions have a requirement that "the opponent does not show that the possible source of the information or other circumstances indicate a lack of trustworthiness." *See* Fed. R. Evid. 803(6); (8).[11]  Plaintiff contends the first responders were not at the scene to investigate the cause of the fire, were not present when the fire started, and have no special skills or experience in making causation determinations regarding fires. (Dkt. 97 at 4.)

---

[11] To evaluate trustworthiness, courts look at a nonexhaustive list of four factors: the timeliness of the investigation, the investigator's skill/experience, whether a hearing was held, and possible bias. *Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 167 n.11 (1988).  But, again that list is not exhaustive and the Court finds it largely inapplicable here.

While firefighters' special skills and experience fighting fires are extremely important, the Court agrees they have no (readily-apparent) skills or experience in making causation determinations.[12]  The incident reports buttress this conclusion.  They include detailed facts as to the firefighter's movements on the days of the fires—where they went, what they saw, and what they did.  All of that is fine.  Nothing in the reports, however, suggest the firefighters did anything to determine the causes of the fires.  The absence of any such information (let alone information on each specific firefighter's expertise to provide such an opinion) supports Plaintiff's contention that the opinions are not trustworthy.  Because Plaintiff has shown the source of information indicates a lack of trustworthiness, the Court finds the portion of the fire incident reports containing causation information are inadmissible and must be redacted.

---

[12] The Court notes Defendant SAC also fails to meet its burden of proving that a hearsay exception exists.  *See United States v. Kennard*, 472 F.3d 851, 856 (11th Cir. 2006).  Defendant SAC merely reiterates the elements required to establish the public records exception and only state the fire incident reports "are also business records." (Dkt. 86 at 5–6.)  Defendant SAC also claims it could call the report preparers at trial.  (*Id.* at 6–7.) While the authors could testify as to their factual observations, they are not entitled to testify as new, not properly disclosed, expert witnesses. Calling the preparers also would not make the written reports admissible.

The same is true of Mr. Porto's testimony.  He may testify about the content of the reports, except the causation determinations.

Plaintiff argues the Atlanta journal newspaper article should also be excluded as hearsay.  Hearsay is a statement, other than one made by the declarant while testifying at trial or hearing, offered in evidence to prove the truth of the matter asserted.  *See* Fed. R. Evid. 801(c).  "Defendant is correct in noting that [an article is] not admissible if offered to prove the truth of the matters contained in [the article]. Newspaper articles, in general, are classic hearsay when offered primarily to prove the truth of the matters therein." *Moon v. Advanced Medical Optics, Inc.*, No. 4:08-CV-0021, 2010 WL 11509121, at *2 (N.D. Ga. Dec. 29, 2010).  Here, Defendant SAC seeks to use the article to establish there was a dryer fire—the truth of the matter in the article.  The article is thus hearsay.

Defendant SAC contends the article is admissible as a business record pursuant to Fed. R. Evid. 803(6).  (Dkt. 86 at 6.)  A strange argument from an experienced lawyer.  A newspaper article is a product of the newspaper business, as distinguished from a record maintained by the paper for the purpose of conducting its business.  *See* Fed. R. Evid.

803(6).  The article is, therefore, not a business record and the Court grants Plaintiff's motion to exclude it.

Defendant SAC next argues the Court should defer ruling on exclusion of the article because it could reduce the article to admissible form before trial.  (Dkt. 86 at 6.)  They argue the witness identified in the article could testify about her factual observations on the day of the fire.  (*Id.* at 6–7.)  That is true.  The Court is not excluding evidence of the fire, just the use of a newspaper article.

Plaintiff also objects to Mr. Porto's use of the article to establish that the hotel had a lint housekeeping problem.  (Dkt. 70 at 8.)  Mr. Porto, seeming to justify his reliance on the article, testified by declaration that "[a]dditional information collected during the course of [his] investigation pertaining to other fire incidents at the hotel within the laundry room such as the Atlanta Journal Constitution article should also be considered in this analysis."  (Dkt. 79-1 ¶ 4.)  This does not show that qualified fire cause and origin experts customarily rely on newspaper articles when determining the origin and cause of a fire.  The Court thus finds Mr. Porto may not discuss the article at trial.  *See Knight through Kerr*, 856 F.3d at 809 ("An expert may rely on hearsay evidence as part

of the foundation for his opinion so long as the hearsay evidence is 'the type of evidence reasonably relied upon by experts in the particular field in forming opinions or inferences on the subject.'" (quoting *Scrima*, 819 F.2d at 1002)).[13]

## B.   Spoliation

Both Plaintiff and Defendant SAC filed motions for spoliation sanctions.  (Dkts. 69; 88.)  Plaintiff moves to exclude evidence of allegedly inoperative fire dampers.  (Dkt. 69.)  Defendant SAC moves for spoliation sanctions in the form of a negative inference and exclusion of expert testimony.  (Dkt. 88.)  After consideration of the parties' briefings and argument at the January 18, 2022 hearing, the Court denies both motions, finding there is no basis to believe either party spoliated evidence.

---

[13] To be clear, the facts surrounding the previous fires are admissible. This could even include evidence the Westin was aware of the alleged cause of the fires, if there is evidence of such knowledge.  In other words, the Court is not excluding evidence that someone at Westin saw the reports or the newspaper articles and gained some relevant knowledge from them.   The Court simply finds Mr. Porto may not admit the causation findings in the reports or the facts alleged in the article during his testimony.  The same is true of the alleged lint problem.  Evidence of lint accumulation may be admitted and Mr. Porto may testify about the danger it poses.  He many not, however, testify there was a lint problem based upon the newspaper article.

### 1.    Legal Standard

Spoliation is the "destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *Graff v. Baja Marine Corp.*, 310 F. App'x 298, 301 (11th Cir. 2009) (internal quotations and citation omitted).  As an evidentiary matter, the imposition of spoliation sanctions is governed by federal law in diversity suits. *Flury v. Daimler Chrysler Corp.*, 427 F.3d 939, 944 (11th Cir. 2005).  Federal law in the Eleventh Circuit, however, does not set forth specific guidelines in determining whether sanctions for spoliation are appropriate. *Id.*  As a result, the spoliation analysis is "informed by Georgia law," which the Eleventh Circuit has found to be "wholly consistent with federal spoliation principles." *Id.*

A party seeking to impose sanctions for spoliation must show: (1) the missing evidence existed at one time; (2) the opposing party had a duty to preserve the evidence; and (3) the evidence was crucial or necessary to the litigation. *In re Delta/AirTran Baggage Fee Antitrust Litig.*, 770 F. Supp. 2d 1299, 1305 (N.D. Ga. 2011).  If spoliation has occurred, Georgia courts further evaluate the following five factors in

determining whether spoliation sanctions are warranted: (1) whether the movant was prejudiced as a result of the destruction of evidence; (2) whether any prejudice can be cured; (3) the importance of the evidence; (4) whether the spoliator acted in good or bad faith; and (5) the potential for abuse if expert testimony about the evidence is not excluded. *Flury*, 427 F.3d at 945 (citing *Chapman v. Auto Owners Ins. Co.*, 469 S.E.2d 783, 784 (Ga. Ct. App. 1996)). The Eleventh Circuit has held that a showing of bad faith is required to impose sanctions. *See, e.g.*, *Bashir v. Amtrak*, 119 F.3d 929, 931 (11th Cir. 1997) ("[A]n adverse inference is drawn from a party's failure to preserve evidence only when the absence of that evidence is predicated on bad faith."); *Tesoriero v. Carnival Corp.*, 965 F.3d 1170, 1184 (11th Cir. 2020) ("[T]he party's reason for destroying evidence is what justifies sanctions (or a lack thereof)."). Malice is not required to find bad faith, instead "[t]he court should weigh the degree of the spoliator's culpability against the prejudice to the opposing party." *Flury*, 427 F.3d at 946. Georgia courts have also "held parties who are experienced in claims handling and litigation procedure, such as an insurance company, to higher standards than laypersons in evaluating their obligation to preserve evidence." *S. Ga. Prods., Inc. v. Pioneer*

*Mach., Inc.*, No. 1:02-CV-0886, 2004 WL 5492716, at *3 (N.D. Ga. Mar. 31, 2004).  As sanctions for spoliation, the court may dismiss an action, exclude testimony, or provide a jury instruction that spoliation of evidence raises a presumption that the evidence was non-favorable to the spoliator.  *Flury*, 427 F.3d at 945.  When spoliation has occurred, the district court has wide discretion to impose sanctions.  *Id.* at 944.

### 2.    Plaintiff's Motion

Plaintiff moves to exclude evidence of allegedly inoperative fire dampers based on a claim Defendant SAC altered or tampered with the dampers after they were removed from the hotel.  (Dkt. 69.)  The fire dampers were essentially metal curtains located within the dryer ductwork that, if working properly, should have closed during the fire to minimize expansion of the fire.   Defendant SAC's employee, Jack Simmons, testified that he saw the fire dampers on the day of the fire, and they were not closed properly.  (Dkt. 75-1 at 48:16–49:11.)  He also testified that he took pictures of them at that time.  (*Id.* at 48:16–17.)  He told no one at the Westin hotel about his observations.  (*Id.* at 50:2–11.)  About a week later, Mr. Simmons saw the dampers in Defendant SAC's dumpster.  (*Id.* at 50:16–18.)  He took four of them—identified by the

parties as Dampers A, B, C, and D—to Defendant SAC's office, but told no one at the hotel he did so. (*Id.* at 50:24–52:17.) He testified that the dampers were stored in Defendant SAC's office from March 2018 until August 2020. (*Id.* at 52:9–12.)

As mentioned above, Defendant SAC's expert relies on the fire dampers as part of his opinion, specifically concluding the fire spread farther than it should have spread because certain dampers failed to close. (Dkts. 68-1 at 21; 70-1 at 24.) He explained that each damper has a "fusible link" that spans the damper curtain, attaching to each side of the curtain to "strap hooks" on the damper frame. (Dkt. 70-1 at 15.) In this way, the fusible link holds the damper curtain in the open position. (*Id.*) In a fire, heat causes the fusible link to separate into two pieces, allowing the damper curtain to fall. (*Id.*) Mr. Porto determined Damper A and B functioned properly, the fusible links separating and allowing gravity to close the curtain. (*Id.* at 15–16.) Indeed, photos show separated fusible links still attached to strap hook on each side of the curtain. (*Id.*) He says Damper D did not close because someone had inserted a metal rod through the strap hooks, thus locking the damper in the open position during the fire. (*Id.*) Photos of the damper confirm this

and the parties do not dispute Mr. Porto's conclusion that the rod was in place at the time of the fire and prevented the damper from closing.  (*Id*.)

The issue between the parties centers on Damper C.  Mr. Porto explains that Damper C had a properly positioned fusible link spanning from a strap hook on one side of the damper to strap hook on the other side, holding the damper curtain up (that is, in the open position).  (*Id*. at 16.)  That fusible link separated during the fire (as expected) possibly allowing the damper curtain to close.  (*Id*.)  He explained Damper C also had a second fusible link, this one attached to a strap hook on one side of the curtain but (apparently) not connected to a strap hook on the other side.  Mr. Porto's report suggests Damper C (like Damper D) did not close. (*Id*. at 22.)   But, the report also includes a photo of it in the closed position.  (*Id*. at 17 (Figure 12).)  And, at his deposition Mr. Porto testified that he has no opinion about whether it closed during the fire.  (Dkt. 81-1 at 124:25–125:14.)

Despite no evidence the second fusible link prevented the damper from closing, Plaintiff tees off on it, saying someone must have added it to the damper ***after*** the fire.  It claims the plastic on the wire attaching it to the strap hook would have melted if it had been attached to the

damper during the fire. (Dkt. 69 at 4.) It argues the second fusible link also showed no evidence of fire damage, even though it should have separated at temperatures well below the fire's intensity. (*Id.*) Plaintiff's expert, Ashley Cornelison, provided a declaration reaching the same conclusion. (Dkt. 69-4 ¶¶ 4–7.) As a result of all this, Plaintiff argues the Court should exclude all evidence of the fire dampers. (Dkt. 69 at 9–12.)

No direct evidence suggests someone added the second fusible link after the fire. And, Defendant SAC's circumstantial evidence (that is, the lack of heat damage to the link or wire) does not suggest that happened. It is entirely plausible (given a lack of evidence as to whether the damper activated during the fire) that the second fusible link was always there but was not in use as it did not span the bottom of the damper curtain. In that case, the activation of the curtain (when the first fusible link activated) would have protected the second fusible link from the heat and fire. Mr. Porto even agreed that the second link could have been "tucked up inside the damper" and thus protected from the heat. (Dkt. 81-1 at 123:4–124:7.) In other words, it is entirely plausible that the second fusible link and wire could have survived the fire with no evidence of fire

damage.[14]  And, of course, none of this touches the undisputed fact that Damper D had been modified to remain in the open position.[15]  Plaintiff may use these issues during cross-examination, but the Court denies its motion for sanctions.

### 3.    Defendant SAC's Motion

Defendant SAC brings its own motion for sanctions, saying the Westin hotel spoliated evidence when it disposed of the ductwork from the laundry ventilation system and at least one fire damper.  (Dkt. 88 at 7.)  As a result of this alleged spoliation, it requests the Court prevent Plaintiff's expert from offering any opinion the laundry equipment did not start or exacerbate the fire and/or instruct the jury it may assume the spoliated evidence would have shown the fire started in the laundry room.  (*Id.* at 11, 15.)

Plaintiff concedes the Westin hotel discarded the duct work and that the evidence might be relevant (or even crucial) to the defense.  But

---

[14] Mr. Porto even noted that the wire on the second fusible link showed "some discoloration, consistent with fire exposure—heat exposure.  It's hard to say."  (Dkt. 81-1 at 123:4–124:7.)

[15] There was a fifth damper that was not retained by either party but may have been photographed.  (Dkt. 84 at 5.)  Perhaps the jury will hear about that damper at trial.

Plaintiff says Defendant SAC cannot show the Westin or Plaintiff owed them a duty to preserve the missing evidence prior to the time it threw the evidence away.  (Dkt. 95 at 11.) A party's duty to preserve is only triggered when litigation is reasonably anticipated.  *See In re Delta Antitrust Litig.*, 770 F. Supp. 2d at 1307.  If Plaintiff owed any preservation duty to Defendant SAC, it arose only when Plaintiff could have "reasonably foreseen" civil litigation. *See Walker v. U.S., I.R.S.*, No. 4:07-cv-0102, 2009 WL 1241929, at *1 (N.D. Ga. Feb. 26, 2009) ("Spoliation is the destruction or significant alteration of evidence, or the failure to preserve property for another's use in pending or reasonably foreseeable litigation.").

Plaintiff contends that, immediately after the fire, Stacey Flannigan (one of Defendant SAC's employees) admitted its subcontractor caused the fire. (Dkt. 95 at 9–10.) Specifically, Mike Horne (the Westin hotel engineer) testified that, on the day of the fire, he ran into Mr. Flannigan who told him "either a spark or piece of slag may have jumped over and gotten into the vent shaft." (Dkt. 83-1 at 27:1–14.)  Mr. Horne testified that Mr. Flannigan told him, when one of Defendant SRC's employees "was grinding a piece of slag or a spark, it sounded like

a piece of metal, had—when he was grinding it, jumped over into the shaft because he said he saw the lint just below. . . . [H]e saw that ignite, and then he said he saw it roll over and fall down into the shaft and that's what—it started even more after that." (*Id.* at 43:5–18.)  Mr. Horne continued, testifying Mr. Flannigan told him "that the subcontractor was grinding the rail when slag came off, jumped into the lint shaft . . . [and] that's what ignited the fire." (*Id.* at 44:4–9.)  Based on Mr. Flannigan's alleged acceptance of responsibility for the fire, Plaintiff argues the Westin hotel had no reason to believe litigation would arise when it began repairing the ductwork and throwing away the damaged system. (*Id.*)

Defendant SAC disputes the alleged acceptance of responsibility. At his deposition, Mr. Flannigan confirmed that one of Defendant SRC's foreman, Chad Phillips, called him from the rooftop to tell him about the fire. (Dkt. 76-1 at 30:20–32:11.)  But Mr. Flannigan testified that he never talked to Mr. Phillips about what caused the fire. (*Id.* at 45:17–23.) Mr. Phillips also testified.  He said he "did not personally see a spark go down in this shoot." (Dkt. 74-1 at 81:21–11; 102:1–23.)  Mr. Phillips also said he "did not tell [Mr. Flannigan] specifically that fire was started by a spark from my or our grinder." (*Id.* at 83:8–13.)  Mr. Phillips' written

statement provided to Marriott also mentions nothing about dropping a piece of metal down the exhaust shaft. (Dkt. 72-1 at 30:14–17, 133.)

There is a significant dispute of fact as to whether the Westin hotel had a reason to anticipate litigation, thus precluding sanctions. At the very least, the Court concludes from the disputed facts that Defendant SAC has failed to satisfy its burden of showing the hotel had a duty to preserve the evidence immediately following the fire.

Defendant SAC contends this does not matter because, on March 22, 2018, Plaintiff's insurance adjuster recommended Plaintiff retain subrogation counsel and Plaintiff did so five days later, thus evidencing it anticipated litigation. (Dkts. 102 at 4; 73-1 at 248, 292, 297.) Plaintiff says the mere retention of subrogation counsel does not indicate it anticipated litigation against Defendant SAC, let alone litigation about the cause of the fire. Alternatively, Plaintiff contends that, even if it should have saved the dampers, there is no evidence of bad faith so as to warrant sanctions. (Dkt. 95 at 12.) Rather, Plaintiff says the evidence shows the Westin hotel proceeded with repairs in good faith reliance on Defendant SAC's admission as to the cause of the fire. (*Id.* at 13.)

The Court agrees with Plaintiff. The mere retention of subrogation counsel does not indicate anticipation of litigation let alone that the ductwork would be part of that litigation. And there is no evidence of bad faith. By the time some of the ductwork was removed, the hotel's underwriter thought Defendant SAC had taken responsibility for the fire. Defendant SAC has presented no evidence to challenge Plaintiff's assertion that the duct work was removed and discarded by the hotel's subcontractors during normal clean-up and repair of the system following the fire. Indeed, prior to the January 18, 2022 hearing before this Court, Defendant SAC prepared a timeline of events relevant to its spoliation claim. (Dkt. 155-1.) In it, Defendant SAC represented (based on evidence in the record) that Plaintiff had begun replacing some of the ductwork as early as March 20, 2018—two days before the adjuster allegedly recommended Plaintiff obtain subrogation counsel. (*Id.* ¶ 5.) Another entry suggests Westin's contractor had completed removal of all the ductwork from the laundry room by March 22, 2018—the day of the recommendation. (*Id.* ¶ 8.)[16] No evidence currently before the Court

---

[16] Another entry indicates the hotel's subcontractors might have continued removing ductwork in the laundry room for another 10 days,

supports Defendant SAC's claim the hotel removed the ductwork after it should have reasonably foreseen litigation or otherwise acted in bad faith. If the evidence is different at trial, the Court will consider appropriate sanctions. But, on the evidence presented, the Court denies Defendant SAC's motion for spoliation sanctions.

---

which would put that 4 days after Plaintiff retained subrogation counsel. (Dkt. 115-1 ¶ 20.) Defendant SAC cites the testimony of Ashley Cornelison (Plaintiff's fire causation expert) in support of that representation. But, Mr. Cornelison actually testified that, at the time of his inspection, new dampers and ductwork were already in place. (Dkt. 117-1 at 48:6–12.) The citation used by Defendant SAC seems to be in error as it contains a non-sensical statement by Mr. Cornelison that "the ductwork was in the process of beginning their remediation." (*Id.* at 93:21–22.) (Defendant SAC cites page 92 of the deposition, but that falls on page 93 of Docket entry 117-1.) Mr. Cornelison only testified that equipment in the laundry room was being removed. There seems to be no evidence anyone removed the ductwork after the subrogation recommendation, particularly in the light of the contractor's invoice indicating the work had been completed by that date. (Dkt. 115-1 ¶ 8.) But, even if there were, the evidence still shows the Westin's subcontractors began that process well before, thus negating any suggestion of bad faith.

## C.     Motions to Exclude Experts

Plaintiff moves to exclude certain testimony and report of Defendant SAC's experts Christopher Porto and Defendant SRC's expert Frank Hagan.  (Dkts. 68; 77.)  The Court denies both motions.

### 1.     Legal Standard

Trial courts serve a critical gate-keeping function for the admissibility of expert testimony.  *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993).   Expert testimony can be particularly persuasive, and as such, the role of the trial court is to keep speculative and unreliable testimony from reaching the jury.  *McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1256 (11th Cir. 2002).  The gatekeeping function, however, "is not intended to supplant the adversary system or the role of the jury."  *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1311 (11th Cir. 1999).  "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."  *Daubert*, 509 U.S. at 596.

Federal Rule of Evidence 702 governs the admissibility of expert opinions:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. In determining the admissibility of expert testimony under Rule 702, the Eleventh Circuit employs a rigorous three-part inquiry. *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004). That is, expert testimony is admissible when

> (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

*Id.* (citing *City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 562 (11th Cir. 1998)). The admissibility of an expert's opinion thus turns on three things: qualification, reliability, and helpfulness. *See id.*

Turning first to the qualification, expert status may be based on knowledge, skill, experience, training, or education. Fed. R. Evid. 702. "[T]here is no mechanical checklist for measuring whether an expert is

46

qualified to offer opinion evidence in a particular field." *Santos v. Posadas De P.R. Assocs.,* 452 F.3d 59, 63 (1st Cir. 2006).

As for reliability, trial courts must assess "whether the reasoning or methodology underlying the testimony is scientifically valid and . . . whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert*, 509 U.S. at 592–93. To evaluate the reliability of scientific expert opinion, trial courts consider, to the extent practicable: (1) whether the expert's theory can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential error rate of the particular scientific technique; and (4) whether the technique is generally accepted in the scientific community. *Frazier*, 387 F.3d at 1262. "These factors are illustrative, not exhaustive [and] not all of them will apply in every case . . . ." *Id.* The same criteria may be used to evaluate the reliability of non-scientific testimony. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999).

The final requirement for admissibility of expert testimony under Rule 702 is that it must assist the trier of fact. Expert testimony assists the trier of fact "if it concerns matters that are beyond the understanding of the average lay person." *Frazier*, 387 F.3d at 1262. Expert testimony

generally will not help the trier of fact "when it offers nothing more than what lawyers for the parties can argue in closing arguments." *Id.* at 1262–63. Expert testimony does not help the trier of fact if it fails to "fit" with the facts of the case. *McDowell v. Brown*, 392 F.3d 1283, 1298–99 (11th Cir. 2004). Expert testimony lacks "fit" when "a large analytical leap must be made between the facts and the opinion." *Id.*; *see also Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 147 (1997) ("A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.").

### 2.   Christopher Porto

As explained above, Mr. Porto offered the opinion in his written report that at least one of the fire dampers failed to close as intended and that this error contributed to the spread of the fire. (Dkt. 70-1 at 24.) But, at his deposition, Mr. Porto stated the fire could have spread past the fire dampers ***before*** the fusible links melted and allowed the dampers to close. (Dkt. 68 at 4.) Mr. Porto further admitted he did not know how long it would take for the fusible links to melt and, although he identified the Response Time Index ("RTI") as a scientific test to determine that response time, he did not complete that analysis here. (Dkt. 81 at

200:19–202:4, 216:11–17.)  Based on this, Plaintiff seeks to preclude Mr. Porto's opinion that the altered damper allowed the fire to spread as "mere conjecture" and not the product of any scientific analysis.[17]  The Court disagrees.

Mr. Porto conducted his investigation pursuant to the National Fire Protection Act ("NFPA") 921, Guide for Fire and Explosion Investigations.  (Dkt. 56-1 at 7.)  This guide "is the industry standard for fire investigation."  *United Fire and Cas. Co. v. Whirlpool Corp.*, 704 F.3d 1338, 1341 (11th Cir. 2013).  "The NFPA 921 calls for the scientific method to be used in conducting these investigations."  *Housley v. LiftOne, LLC*, No. 7:20-CV-00010, 2021 WL 4197596, at *5 (N.D. Ala. Sept. 15, 2021).  The steps of the scientific method are: (1) recognize the need (identify the problem), (2) define the problem, (3) collect data, (4) analyze the data, (5) develop hypotheses, and (6) select final hypothesis.  *Id.*  Mr. Porto identified there was a fire and defined the problem by conducting an investigation.  Mr. Porto then collected data by visiting the

---

[17] Plaintiff also argues Mr. Porto's opinion that the fire dampers did not close is unreliable because it is based on altered evidence.  (Dkt. 68 at 14.)  As discussed above, the Court finds no evidence the dampers were tampered with after the fire.  The Court thus refuses to grant Plaintiff's motion on this ground.

fire scene, reviewing the available evidence (including photographs), speaking to witnesses, and examining fire suppression systems. (Dkt. 56-1 at 7.)

Plaintiff contends Mr. Porto's "testimony and report regarding the fire dampers were inadequate. The jury will be confused by Porto's personal opinions and it will be difficult for them to comprehend that they are not based on recognized scientific methods." (Dkt. 68 at 18–19.) The Court, however, finds Mr. Porto's opinions are based on recognized scientific methods. Mr. Porto's opinions that the fire dampers would have stopped the spread of the fire are not based on his experience alone, but also on the facts (1) these specific dampers were designed to stop the passage of flame, (2) these dampers were significantly altered so their functionality was impaired in the subject fire, and (3) the dampers condition during the fire is supported through testimony and pictures. Mr. Porto's testimony as to the origin and cause of the fire is clearly helpful.

Mr. Porto's failure to conduct an RTI analysis and determine how quickly the dampers should have closed (as well as his concessions during his depositions) may be explored during cross examination. Those facts

may undermine the credibility of his analysis but they do not render his opinions conjecture or his methodology unscientific. *See Jones v. Otis Elevator Co.*, 861 F.2d 655, 663–63 (11th Cir. 1988) ("Expert testimony is admissible which connects conditions existing later to those existing earlier provided the connection is concluded logically. Whether this logical basis has been established is within the discretion of the trial judge and the weaknesses in the underpinnings of the expert's opinion go to its weight rather than its admissibility. On cross-examination, the opposing counsel is given the opportunity to ferret out the opinion's weaknesses to ensure the jury properly evaluates the testimony's weight and credibility.").

Plaintiff next contends Mr. Porto's testimony on the adequacy of the Westin's housekeeping measures should be excluded because his opinions are unreliable, not based on sound methodology or evidence, and not helpful to the jury. (Dkt. 68 at 19.) Plaintiff contends his opinions about lint are unreliable because he could not quantify how much lint was too much lint, did not inquire as to when the lint was last cleaned, and did not measure how much lint was actually present. (*Id.* at 20.) The Court disagrees. Mr. Porto's opinion is based on several grounds, including: (1)

NFPA standards identifying the accumulation of lint creates a fire hazard; (2) the combustible properties of lint; (3) Mr. Porto's personal observations of the accumulation during the Westin's normal cleaning schedule, and (4) Mr. Porto's explanation of the spread of fire in the Westin's ventilation system.  On June 25, 2020, Mr. Porto inspected the Westin's laundry ventilation system and observed and photographed multiple areas where lint accumulated.  (Dkts. 56-1 at 9–12; 79-1 ¶ 27.) According to Mr. Porto it was not the lint depth, but the coverage that was important because the heat of the fire is directly related to the surface area covered with lint.  (Dkt. 81-1 at 225:2–5, 227:18–228:3.) Plaintiff's contention that Mr. Porto cannot quantify how much lint is too much lint is appropriate for cross-examination but is not sufficient to exclude his housekeeping testimony.

Plaintiff argues Mr. Porto's testimony and report regarding housekeeping measures are confusing and misleading because he does not and cannot identify what adequate measures would be.  (Dkt. 68 at 21.) Mr. Porto was aware the Westin had several housekeeping measures in place but failed to ascertain why those measures were inadequate or what additional housekeeping measures should have been taken.  (*Id.* at

21–22.)  Mr. Porto concluded the Westin's measures were inadequate because they failed to limit the potential fire hazard from the accumulation of lint.  (Dkt. 56-1 at 19.)  His opinions are also helpful because a lay person may not realize that accumulations of lint can lead to a fire or exacerbate it.  The Court denies Plaintiff's motion to exclude Mr. Porto's opinions and testimony.[18]

### 3.  Frank Hagan

Plaintiff also moves to exclude the proffered expert testimony of Mr. Hagan regarding the proper functionality of the fire dampers as unreliable, not based on sound methodology or evidence, and not helpful to the jury.  (Dkt. 77 at 9.)  Plaintiff first argues Mr. Hagan does not rely on any scientific reasoning or methodology to conclude that, if the fire dampers were properly functioning, they would have activated and stopped the spread of the fire.  (*Id.*)  Mr. Hagan admits he does not know how long the lint would have taken to burn through and melt the fusible link, and that the fire could have spread through the duct to cause damage even if the damper functioned properly.  (Dkts. 77 at 9–10; 82-1

---

[18] The Court has previously ruled on Mr. Porto's use and testimony from and regarding the fire incident reports and newspaper article.  It does not repeat that determination here.

at 66:16.)  Plaintiff thus claims his opinion is unsubstantiated, unreliable ipse dixit.  (Dkt. 77 at 9.)  The Court disagrees.

Mr. Hagan has been a professional, mechanical engineer for more than 30 years.  (Dkt. 61-1 at 6.)  He conducted his analysis pursuant to NFPA, Guide for Fire and Explosion Investigation.  (*Id.* at 2.)  After a review of documents, fire codes, handbooks, scientific literature, and an in-person inspection of the fire scene and fire dampers, Mr. Hagan drafted a report.  (*Id.*)  In his report, Mr. Hagan noted one of the fire dampers was pinned open at the time of the fire where a fusible link should have been installed.  (*Id.* at 3.)  Mr. Hagan concluded that the hotel failed to maintain the fire dampers as required by NFPA.  (*Id.* at 5.)  He opined that fire damage to the laundry room and ductwork would have been greatly reduced, if not prevented, had the dampers been maintained and operational.  (*Id.*)  Plaintiff argues there is no evidence the fire dampers are designed or tested to stop a fire under the conditions Mr. Hagan admitted existed at the hotel at the time of the fire, but that

is an issue for cross-examination.  As with Mr. Porto, the Court finds Mr. Hagan's methodology reliable.

Plaintiff also contends Mr. Hagan's "testimony and report regarding the fire dampers were inadequate. A jury would be confused and misled by Hagan's statements regarding the fire dampers." (Dkt. 77 at 11.)  First, this argument is conclusory.  Second, Mr. Hagan was retained to determine whether the Westin's fire suppression systems were compliant with applicable fire codes and the origin and cause of the fire.  (Dkt. 107 at 8–9.)  This information is likely beyond the scope of a lay person, so Mr. Hagan's testimony will be helpful to the jury.  The Court thus denies Plaintiff's motion.

### D.    Joinder

On July 9, 2021, Defendant SRC filed a motion for leave of court to join Defendant SAC's response to Plaintiff's motion to exclude fire dampers (Dkt. 85); response to Plaintiff's motion to exclude fire reports (Dkts. 86; 87); motion for spoliation sanctions (Dkt. 88); and reply brief in support of spoliation sanctions (Dkt. 102).  (Dkt. 109.)  Plaintiff has not filed a response, "indicat[ing] that there is no opposition to the motion."  LR 7.1(B), NDGa.  The Court grants this motion.  *See Capitol*

*Specialty Ins. Co. v. PTAV, Inc.*, 331 F. Supp. 3d 1329, 1337–38 (N.D. Ga. 2018) (granting defendant's motion to join co-defendants' opposition brief).

## III.  Conclusion

The Court **GRANTS** Defendant SRC's Motion for Leave of Court to Join in Certain Filings by Co-Defendant SAC.  (Dkt. 109.)

The Court **GRANTS IN PART** and **DENIES IN PART** Plaintiff's Motion to Exclude Evidence of Atlanta Fire Department Incident Reports and Atlanta Journal Newspaper Article.  (Dkt. 70.)

The Court **DENIES** Defendant Steve Ayers Construction Co., Inc.'s Motion for Summary Judgment.  (Dkt. 71.)

The Court **DENIES** Plaintiff's Motion to Exclude Evidence of Allegedly Inoperative Fire Dampers Predicated on Spoliation of Evidence (Dkst. 69) and Defendant's Motion for Spoliation Sanctions (Dkt. 88).

The Court **DENIES** Plaintiff's Motion to Exclude Certain Testimony and Report of Christopher J. Porto (Dkt. 68) and Plaintiff's Motion to Exclude Certain Testimony and Report of Frank Hagan (Dkt. 77).

The Court **DIRECTS** the parties, no later than March 3, 2022, to file a consolidated pretrial order. The Court may sanction the parties, including dismissing this action, if they fail to comply with this order. The Court **DIRECTS** the Clerk to submit this matter to the Court after March 3, 2022, if the parties fail to file their consolidated pretrial order.

The jury trial in this case is set for August 16, 2022, at 1:30 p.m., in Courtroom 1906. An order is forthcoming with a date for a pretrial conference and deadlines for motions in limine, requests to charge, proposed verdict forms, and deposition designations.

**SO ORDERED** this 1st day of February, 2022.

_____
MICHAEL L. BROWN
UNITED STATES DISTRICT JUDGE